LUCY A. BROOME *vs.* JAMES S. BROOME.

No. 96-P-1281.

Middlesex. March 26, 1997. - September 22, 1997.

Present: PORADA, SMITH, & IRELAND, JJ.[1]

*Divorce and Separation,* Alimony, Separation agreement, Modification of judgment.

In a postjudgment proceeding in a divorce action, in which the former wife sought, on the basis of countervailing equities, the continuation of alimony payments to her beyond the period set forth in the parties' separation agreement incorporated in the judgment, there was insufficient evidence to support the judge's finding that the former wife was destitute and would become a public charge if the separation agreement were specifically enforced, and there was insufficient evidence of other countervailing equities to warrant the judge's order that the former husband continue to pay support: the matter was remanded for further proceedings. [544-546]

CIVIL ACTION commenced in the Middlesex Division of the Probate and Family Court Department on April 11, 1983.

A complaint for modification, filed on November 12, 1993, was heard by *Beverly Weinger Boorstein,* J., and motions to amend judgment were heard by her.

*Joseph H. Walsh* for James S. Broome.

*Madeline McLaughlin Corey* for Lucy A. Broome.

SMITH, J. James S. Broome (husband) appeals from a Probate and Family Court judgment ordering the continuation of spousal support to Lucy A. Broome (wife) based on the doctrine of countervailing equities. We summarize the relevant facts.

On June 23, 1983, the Probate and Family Court entered a judgment of divorce nisi incorporating, but not merging the par-

---

[1]Justice Ireland participated in the deliberation of this case while an Associate Justice of this court, prior to his appointment as an Associate Justice of the Supreme Judicial Court.

ties' separation agreement (agreement); therefore, the agreement survived and retained its own legal significance. *Broome* v. *Broome*, 40 Mass. App. Ct. 148, 148 (1996). The parties had three children; the youngest child was thirteen years of age at the time of the divorce. The agreement addressed, among other things, the issues of the division of the marital property, child support, educational expenses, and alimony. Under the agreement, the wife received the marital domicile, a summer home on Martha's Vineyard, and $66,500 per year in "unallocated support," subject to an escalator clause. The support payments were to terminate upon the emancipation of the youngest child, some ten years after the date of the divorce.[2] In exchange for a cash payment of $62,000, the wife waived all claims against the husband following the emancipation of their children.

Since the June, 1983, entry of the judgment of divorce nisi, the parties have filed numerous court actions against each other. Because those actions played a role in the judge's decision in the present case, we will briefly discuss them.

Prior to the present action, the wife filed four contempt actions against the husband, none of which resulted in a judgment of contempt. As a result of the wife's filing of the second contempt action, the parties entered into another agreement (modification agreement) to modify the original agreement. Consequently, the wife's second contempt action was dismissed with prejudice on February 22, 1985, and a judgment entered March 13, 1985, nunc pro tunc February 22, 1985, changing the payment of unallocated support to the wife to $80,750 per year and eliminating the escalator clause, while keeping the remaining provisions of the original agreement intact, including the termination date of the support payments.

On January 6, 1986, the husband filed a complaint for modification in Probate Court seeking custody of the children; apparently this complaint was dismissed for lack of prosecution. In 1991, the husband brought an action in the Superior Court seeking a judgment pursuant to G. L. c. 231A, declaring that the youngest child had become emancipated under the terms of the agreement and requesting the return of support payments made by him to the wife after the time that the youngest child alleg-

---

[2]"Emancipation is defined in the agreement as 'attaining the age of twenty-three (23), becoming self-supporting, marrying, dying, or obtaining a four year college degree, whichever occurs earliest.' " *Broome* v. *Broome*, 40 Mass. App. Ct. at 149 (1996).

edly became emancipated.[3] Subsequently, the wife filed a counterclaim alleging fraud and seeking damages for the husband's alleged misrepresentation of his income at the time when the parties entered into their original agreement and at the time that the agreement was modified in 1985, by way of the modification agreement. On November 12, 1993, a Superior Court judge entered separate default judgments in favor of the husband and dismissed the wife's counterclaim for her failure to file answers to interrogatories. Mass.R.Civ.P. 33(a), as amended, 368 Mass. 906 (1976). The Superior Court judge ruled that the youngest child had become emancipated before September 1, 1989, and that the parties' other children became emancipated by May, 1991. *Broome* v. *Broome*, 40 Mass. App. Ct. at 151. The judge assessed damages in the amount of $196,370.08, representing support payments made by the husband after May, 1991; together with interest and costs, the total judgment was approximately $229,000. On appeal, we ordered the judgments vacated and remanded the matter to the Superior Court for further proceedings.[4] *Broome* v. *Broome*, 40 Mass. App. Ct. at 154.

On November 12, 1993, the wife filed the present complaint for modification in the Middlesex County Probate and Family Court seeking an order of support on the ground that countervailing equities existed which warranted a modification of the February, 1985 judgment. After an evidentiary hearing, a Probate Court judge ordered judgment to issue in favor of the wife. In support of her order, the judge filed a memorandum of decision containing her findings of fact. We summarize the judge's findings.[5]

After the 1983 divorce, the wife continued the childrens' private secondary school education at her own expense (there

---

[3]In his Superior Court action, the husband claimed that the youngest child's "involvement in a wilderness camping expedition during the year between her completion of high school in 1989 and her commencement of college in 1990, and her alleged full-time employment during part of that year, rendered her 'self-supporting' and therefore, 'emancipated.' " *Broome* v. *Broome*, 40 Mass. App. Ct. at 149.

[4]Although the appeal was heard prior to the judge's decision in this matter, the remand was ordered after the judge issued her decision. We have no information as to what occurred in the Superior Court after remand.

[5]The judge later supplemented her findings in another memorandum filed in response to both parties' motions to amend the judgment. We include those findings here.

was no provision in either agreement for support for such schooling). During her marriage, the wife had been exposed to some lectures on real estate. She began investing in real estate and purchased two condominiums in Winthrop, however, the condominiums were eventually foreclosed by the Federal Deposit Insurance Corporation (FDIC), and the wife was left without assets and owed $160,000 to the FDIC and $80,000 to second mortgage holders.

The wife moved to Connecticut where, according to the judge, "she had no family or friends, where she has no job leading to self sufficiency." The wife lives in a two-bedroom basement apartment in a working class neighborhood in Greenwich, Connecticut. She is employed at a local historical society and works ten hours a week earning $80. The judge found that the wife's earning potential was an "approximate amount of $10,000.00 to $15,000.00 per annum," in addition to her present earnings.

According to the wife, she had not filed any job applications because she had not seen any available jobs in the newspapers which would support her "in a decent and dignified manner." Based on the wife's testimony, the judge concluded that "such a job would have to pay $40,000 to $50,000 per year."

The judge found that the wife's "actual income in 1994 was $9,309.00, $6,729.00 of which was from support."[6] The wife's liabilities amount to $559,000.[7] The wife's assets consisted of an automobile of "negative value." Further, the judge found that the wife's "reasonable living expenses are approximately $1,000 per week if she is to replace her automobile from time to time and pay for uninsured medical and dental expenses as well as monthly rent and usual cost of living."

The judge ruled that the wife is "destitute" and "through no fault of her own is eligible to be a public charge." The judge concluded that "[o]n the theory of countervailing equities [the husband] is responsible to pay under these circumstances sufficient funds to keep [the wife] off welfare and at a decent level of support." The judge declined to enforce specifically the modified agreement; instead, she ordered the husband to pay alimony to the wife in the amount of $750 per week beginning March 3, 1995, and continuing until the wife's death or remarriage or the

[6]The judge's findings do not identify the source of the wife's "support."

[7]This figure included the $229,000 judgment entered in the Superior Court in favor of the husband which was subsequently vacated by this court on March 12, 1996.

husband's death, whichever is sooner. The judge also ordered the husband to pay $25,000 in legal fees in connection with the wife's modification complaint and an additional $3,000 "to obtain counsel in connection with her current indebtedness."

Both parties filed motions to amend the judgment. The wife requested that the judgment be amended by awarding alimony retroactive to March 2, 1994, and by making some typographical and factual changes. In his motion to amend the judgment, the husband compiled a long list of alleged errors on the part of the judge and requested that the judge strike the judgment in favor of the wife and enter judgment in favor of the husband.

On July 27, 1995, the judge allowed the wife's motion to amend the judgment in part and denied the husband's motion. In a memorandum the judge, without hearing any further evidence, expanded her reasons for ordering the judgment to issue in favor of the wife. In addition to relying on her conclusion that the wife would become a public charge, the judge found other countervailing equities that she ruled warranted the allowance of the wife's complaint. The judge found that the contempt actions brought by the wife against the husband subsequent to the divorce, and settled by the parties "at the last minutes," bore on the issue of countervailing equities. Also, the judge ruled that the husband should not have brought the Superior Court action for the alleged overpayment of support.[8] The judge awarded the wife alimony in the amount of $750 per week (tax free) "to help prevent the [w]ife from becoming a public charge, as well as to compensate for the financial consequences of the husband's failure to comply with the agreement, and the breach of his duty of good faith and fair dealing."[9]

On appeal, the husband challenges the judge's decision and argues that the wife should not be allowed to dissipate her assets through speculative investments, claim destitute status, and then seek to renegotiate the separation agreement. He claims

[8]The judge stated that the husband's delay in seeking an interpretation of the agreement "was an unfair surprise to the wife" and that had the husband raised the issue earlier, the contract damages would have been far less.

[9]The judge also amended the judgment by changing the date that support payments were to commence and striking the $3,000 payment to the wife to obtain legal counsel for her indebtedness. The judge ordered the husband to pay the wife $7,038 for expenses and disbursements in connection with the modification complaint.

that separation agreements, such as the modification agreement under scrutiny here, would be meaningless if former spouses could take such action.

"If a judge rules, either at the time of the entry of a judgment nisi of divorce or at any subsequent time, that the agreement was not the product of fraud or coercion, that it was fair and reasonable at the time of the entry of the judgment nisi, and that the parties clearly agreed on the finality of the agreement on the subject of interspousal support, the agreement concerning interspousal support should be specifically enforced, absent countervailing equities."[10] *Knox* v. *Remick*, 371 Mass. 433, 436-437 (1976). Countervailing equities include situations where one spouse is or will become a public charge, or where there has been a failure to comply with the agreement. *Id.* at 437. Countervailing equities may also be found on other grounds "at least as compelling as" those discussed in the *Knox* decision. *Stansel* v. *Stansel*, 385 Mass. 510, 516 (1982). See *Hurlbut* v. *Hurlbut*, 40 Mass. App. Ct. 521, 526 (1996).[11] We note that "[a] party seeking modification of an alimony provision in a surviving separation agreement has a heavy burden. Something more than a material change of circumstances must be shown." *Larson* v. *Larson*, 37 Mass. App. Ct. 106, 108 (1994). The rationale for the more stringent standard is manifest: "[a] policy of enforcement supports finality and predictability, allows the parties to engage in future planning, and avoids recurrent litigation in the highly emotional area of divorce law." *Ames* v. *Perry*, 406 Mass. 236, 240-241 (1989). We now turn to the issues raised by the husband.

1. *The judge's finding that the wife will become a public charge if the separation agreement is enforced.* Once a judge "determines that one spouse is or will become a public charge, the judge may order support pursuant to his [or her] statutory authority, not specifically enforcing the separation agreement to the point where the separation agreement would be used to impose support obligations on the taxpayers of the Com-

---

[10]Here, the judge ruled that the original agreement was free from fraud and coercion and fair and reasonable when made. At the time that the original and modification agreements were executed, other Probate Court judges found that they were free from fraud and coercion and were fair and reasonable. *Stansel* v. *Stansel*, 385 Mass. 510, 514 (1982).

[11]We noted in *McCarthy* v. *McCarthy*, 36 Mass. App. Ct. 490, 493 (1994), that "the phrase 'countervailing equity' continues to be in the process of definition."

monwealth." *Knox* v. *Remick*, 371 Mass. at 437. Here, the judge ruled that if the modification agreement was specifically enforced, the wife would become a public charge. The husband challenges the judge's ruling, arguing that there was no evidence to support the judge's finding that the wife either is a public charge or will become one unless she receives support from the husband.

No evidence was produced regarding the eligibility criteria for any public assistance programs in Connecticut, where the wife resides, or whether the wife will even qualify for assistance under any such programs.[12] The lack of evidence is important because in recent years there have been significant changes, nationwide, in the welfare standards.[13]

To complicate the matter even more, the judge's ruling that the wife was destitute was based, in part, on the existence of the $229,000 Superior Court judgment against the wife. As we previously noted, that judgment has now been vacated and, as far as we know, there is no judgment outstanding against the wife.[14]

However, there is no question that the wife's income at the time of the trial was marginal at best. In these circumstances, we think that the best course to follow is to remand the matter to the Probate Court for further hearings on the question of whether the wife is or will be a public charge.

If the judge so finds, she should rethink the amount and duration of the award. In a recent decision, it was held that a judge may consider the spouse's prospects for employment and his or her earning capacity in determining whether a spouse may become a public charge. *Hayes* v. *Lichtenberg*, 422 Mass. 1005,

---

[12]The wife's testimony on this point was not of any assistance. She testified that she had not applied for, or even inquired as to whether she would be eligible for, public assistance.

[13]Indeed, the judge's finding that the wife's earning capacity is in the $10,000 to $15,000 range may have a bearing on whether she may become a public charge under today's standards.

[14]The judge also relied on the wife's debt owed to the FDIC and the second mortgage holders as a ground in support of her ruling that the wife was destitute. Whether, in these circumstances, a judge may consider debts arising from bad investments as bearing on the issue of whether the spouse is, or will become, a public charge has not been the subject of any court decision as far as we know. It does not concern us here because there was no evidence that the wife was making any payments on that debt. Indeed, there was some evidence that the wife was contemplating bankruptcy.

1006 (1996). Here, the judge found that the wife is employable and capable of earning income in the amount of $10,000 to $15,000 a year. There is nothing in the record that shows that the judge considered the wife's earning capacity when she fixed the amount of the award.[15]

Further, "a court should override [the alimony] provisions" of a surviving separation agreement "only to the extent necessary to prevent a former spouse from becoming a public charge." *O'Brien* v. *O'Brien*, 416 Mass. 477, 480 (1993). *Keller* v. *O'Brien*, 420 Mass. 820, 827 (1995), *S.C.*, 425 Mass. 774 (1997). Here, although the judge purported to fashion an award to meet the wife's basic needs, the size of the tax free award ($39,000 a year for life) coupled with the judge's findings concerning the wife's earning capacity, suggest that the judge was actually seeking to secure a solid middle-class lifestyle for the wife, something that exceeds the amount that properly could be ordered.

2. *The other countervailing equities.* The judge specifically found that the husband "has ultimately fulfilled his commitments under the agreement(s) including division of assets, payment of support and college tuition, room and board and books and laboratory fees (deducting per the agreement, two-thirds of the amount paid for room and board from family support)." Therefore, failure to comply with the agreement is not an issue in this matter and does not constitute a countervailing equity.

The judge, however, did find that the "financial consequence of the husband's failure to comply with the agreement" was a countervailing equity. The judge was referring to the four contempt actions brought by the wife and the Superior Court action brought by the husband, all of which resulted in the wife incurring considerable legal bills. The judge cited *Larson* v. *Larson*, 37 Mass. App. Ct. at 109, in support of her ruling.

In the *Larson* decision we stated that "the husband's two prior contempts may bear on the issue of countervailing equities." *Id.* at 109. However, in that case contempt *judgments* had been entered against the husband. Here, all of the contempts

---

[15]We note that in *Hayes*, the Supreme Judicial Court held that the wife had failed to demonstrate something more than a material change in circumstances. However, the court also stated that the wife had substantial assets on which she could draw while seeking employment and resolving her financial difficulties. *Hayes* v. *Lichtenberg*, 422 Mass. at 1006. Here, the wife does not have any assets.

were resolved through settlement and none of them resulted in contempt judgments against the husband. We are reluctant to hold that the mere filing of complaints for contempt can be considered to be a countervailing equity.

The judge also held that the husband had violated "his duty of good faith and fair dealing" by bringing the Superior Court action against the wife; according to the judge, such a breach constituted a countervailing equity that was sufficiently compelling to warrant modification of the agreement. The judge cited once again *Larson* v. *Larson, supra,* in support of her ruling.

The *Larson* decision did not involve "the existence of countervailing equities in the usual sense but [rather] the proper interpretation of the [separation] agreement." *Id.* at 109. In *Larson,* the surviving separation agreement required the husband "to pay the wife $2,500 per month unallocated alimony and child support until the emancipation of the youngest of the couple's three children, and thereafter at the rate of thirty percent of his *annual gross earned income"* (emphasis supplied). *Id.* at 106. After the emancipation of the youngest child, the husband retired at the age of fifty-five, while in good health, and led a life of leisure. *Id.* at 107, 108. The husband refused to pay any alimony to the wife claiming that he no longer had *earned* income. *Id.* at 107. The court held that the husband violated his duty of good faith and fair dealing regarding the alimony provision in the separation agreement where "both parties reasonably contemplated at the time the bargain was reached that the husband would either continue to work in his profession over the course of his normal work life expectancy, as long as he remained in good health, or make some other arrangement for the wife's support." *Id.* at 109.

The judge's actions go far beyond our *Larson* decision. Here, both parties agree that pursuant to the terms of the original and modification agreements, alimony payments were to cease once the parties' children were emancipated. Neither party contends, nor does the record reflect, that the children were still unemancipated at the time that the Probate Court judge issued her decision. Further, the Probate Court judge specifically found that "the proper interpretation of the agreement was for the [h]usband to continue annual payments until [the youngest child's] twenty-third birthday, December 17, 1993"; therefore,

the agreement cannot properly be interpreted to require further payment of alimony.[16]

In sum, the other countervailing equities found by the judge are *not* as compelling as the situations where one spouse is or will become a public charge, or where there has been a failure to comply with the agreement.

The judgments are vacated, and the matter is remanded to the Probate and Family Court for further proceedings in accordance with this opinion.

*So ordered.*

---

[16]Moreover, if the husband's Superior Court action was filed in bad faith and was indeed frivolous, as the Probate Court judge implied, the judge should have left it to this court (or the Superior Court) to fashion an appropriate remedy.